**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

CAROL LORENZ,

               Plaintiff,

vs.

TYSON FOODS, INC., et al.,

               Defendants.

No. C14-4057-LTS

**MEMORANDUM OPINION AND
ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

_____

## I.     INTRODUCTION

This case is before me on defendants' motion (Doc. No. 22) for summary judgment.   Plaintiff has filed a resistance (Doc. No. 23) and defendants have filed a reply (Doc. No. 27).   No party requested oral argument.   The motion is fully submitted and ready for decision.

## II.     PROCEDURAL HISTORY

Plaintiff Carol Lorenz (Lorenz) filed this action in the Iowa District Court for Cherokee County on June 3, 2014, and filed a first amended petition (Doc. No. 2) on June 19, 2014.   The named defendants are Tyson Foods, Inc., d/b/a Tyson Deli, Inc., and Tyson Deli, Inc. (collectively "Tyson").   Lorenz alleges that she was employed by Tyson at its plant in Cherokee, Iowa, until being discharged.   She further alleges that the discharge was based on her age in violation of the Age Discrimination in Employment Act (ADEA) and the Iowa Civil Rights Act (ICRA).

On July 10, 2014, Tyson filed a notice (Doc. No. 1) of removal to this court. Tyson then filed a motion (Doc. No. 4) to dismiss for failure to state a claim, while Lorenz filed a motion (Doc. No. 5) to remand the action to state court.   On September

9, 2014, United States District Judge Mark W. Bennett filed an order (Doc. No. 8) denying the motion to remand and granting the motion to dismiss. However, Judge Bennett gave Lorenz leave to file an amended complaint to plead her claims adequately. Doc. No. 8 at 11-12.

Lorenz filed her amended complaint (Doc. No. 9) on October 9, 2014. Tyson then filed an answer (Doc. No. 14) denying Lorenz's claims. This case was referred to me (Doc. No. 12) on October 22, 2014, after the parties unanimously consented to trial, disposition and judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Discovery closed September 1, 2015, and trial is scheduled to begin January 4, 2016. *See* Doc. Nos. 18, 19.

## III.   RELEVANT FACTS

Except as otherwise noted, the following facts are not in dispute:[1]

Lorenz was employed at Tyson's plant in Cherokee, Iowa, from October 1985 until December 6, 2012, when her employment was terminated. She was 62 years old

---

[1] Some facts are deemed true because Tyson did not properly deny them in its response to Lorenz's statement of additional material facts. Local Rule 56(d) states, in relevant part:

> A reply to an individual statement of additional material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the moving party's refusal to admit the statement, with citations to the appendix containing that part of the record. The failure to reply, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.

N.D. Ia. L.R. 56(d). Many of Tyson's responses state "Qualify" or "Deny," followed by an explanation as to why Tyson contends that the asserted fact is not accurate. However, Tyson regularly failed to cite to any part of the record to support its explanation. *See* Doc. No. 27-1 at 1, 3, 8, 11, 12, 14, 19, 22, 23, 26, 30, 35, 37, 38 and 41. Pursuant to Local Rule 56(d), Tyson is deemed to have admitted each such fact for purposes of its motion.

at the time of her discharge. During the relevant period of time, she worked in the Quality Assurance/Hazard Analysis Critical Control Point (QA/HACCP) department, primarily as a technician in the department's HACCP division. While Lorenz's position was once considered to be an exempt management position, it ultimately became a "management support" position. This was a non-exempt, overtime-eligible position that required Lorenz to record her time worked.

Tyson acknowledges that Lorenz performed her job duties competently but notes that her record included some behavioral and attendance issues. For example, in 2008 her then-supervisor, Jerry Davis, determined that Lorenz repeatedly arrived late but concealed her tardiness by falsely recording that she arrived on time. Lorenz acknowledged that she documented incorrect times. A letter of counseling was issued in response to the situation and Lorenz was warned that the next violation of Tyson's time card policy would result in discharge. Lorenz does not claim that Davis investigated her actions because of any age bias.

In 2011, while supervised by Ashley Palmer, Lorenz had additional tardiness issues. On October 24, 2011, she signed a Management Support Attendance Notification that addressed two attendance-related concepts. First, the document indicated that an unexcused tardy is counted as one-half of an unexcused absence, and that two unexcused absences in a 12-month period would result in termination. Second, she was advised that she had been charged with four "attendance instances" and that incurring eight attendance instances during a 12-month period would result in termination.[2] These issues occurred at a time when the Cherokee plant was struggling

_____

[2] Tyson points out that because the notification reflected six unexcused tardies, Lorenz could have been charged with three unexcused absences, as each unexcused tardy counted as one-half of an unexcused absence. Thus, according to Tyson, Lorenz's employment could have been terminated at that time pursuant to the attendance policy.

and Tyson was seeking more accountability from its employees. Lorenz testified that she understood that Tyson was requesting more accountability at this time.

Tyson ultimately installed a time clock system that automatically reported instances of tardiness. On October 18, 2012, Lorenz signed another Management Support Attendance Notification that itemized three alleged instances of tardiness during 2012, with the most-recent being October 8, 2012. The document indicated that Lorenz was just one attendance notification short of being discharged.

On December 5, 2012, Lorenz was late again, this time by less than two minutes. She contends that she stubbed her toe that morning with enough force to make her believe she may have broken it. It is undisputed that she did not call Tyson to report that she would be late. The following day, Kendra Saunders, who was Tyson's Human Resources Manager at the Cherokee plant, advised Lorenz that she was being discharged because she had exceeded the maximum allowed tardiness. Lorenz told Saunders about the stubbed toe situation but that explanation did not affect the decision. Lorenz had worked for Tyson for 27 years at the time her employment was terminated.

The record is not entirely clear as to who made the decision to terminate Lorenz's employment. In its statement of undisputed facts, Tyson employs the passive voice: "Ms. Lorenz was terminated due to attendance points in 2012." Doc. No. 22-2 at ¶ 30. This statement avoids the issue of which individual (or individuals) at Tyson actually made the discharge decision. In her statement of additional material facts, Lorenz alleges that she "was terminated by the then QA Manager, Ashley Palmer." Doc. No. 23-3 at ¶ 38. Tyson admitted this statement by failing to cite any portion of the record supporting its denial. Doc. No. 27-1 at ¶ 38. Tyson also confirmed that the discharge "was approved by Kendra Saunders a/k/a Schmidt, the on-site Human Resources manager, and Mr. John Cebuhar, Tyson Corporate District Human Resources manager." *Id*. at ¶ 39. In viewing the record most favorably to Lorenz for purposes of Tyson's

motion for summary judgment, I must conclude that Palmer made the decision to terminate Lorenz's employment, that the decision was approved by Saunders and Cebuhar, and that Saunders communicated the decision to Lorenz.

Additional facts will be discussed as necessary in analyzing the parties' arguments.

## IV.   SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the substantive law will identify which facts are material."  *Id*.  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not.  *Id*.

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods,* 415 F.3d 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis*, *Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

No unique summary judgment standards apply to employment discrimination cases. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (en banc) (rejecting prior decisions that applied a "discrimination case exception" to the

analysis of summary judgment motions). However, as Judge Bennett has aptly explained, applying summary judgment standards to the motivation-intensive elements present in most employment discrimination cases is not a simple task:

> Employment discrimination and retaliation, except in the rarest cases, are difficult to prove. They are perhaps more difficult to prove today—fifty years after the passage of the EPA, more than forty years after the passage of Title VII and the ADEA, more than twenty years after the passage of the ADA, and nearly two decades after the passage of the FMLA—than during the earlier evolution of these anti-discrimination and anti-retaliation statutes. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g.*, *Riordan v. Kempiners*, 831 F.2d 690, 697–98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).
>
> My experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective. *See, e.g.*, *id*. Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, the EPA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated

by employers with even a meager imagination. *See, e.g.*, *id.* On the other hand, it is also relatively easy for disgruntled former employees to claim a protected basis under federal and state anti-discrimination laws as a reason for their discharge when in fact they played no part. This is true even when the former employee and/or their counsel believe they did. This is what makes deciding these issues on a paper record daunting.

*Pick v. City of Remsen*, No. C13-4041, 2014 WL 4258738, at *12 (N.D. Iowa Aug. 27, 2014). While the task can indeed be daunting in an employment discrimination case, "the focus of inquiry at the summary judgment stage 'always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic].'" *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1018 (8th Cir. 2005) (quoting *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1336-37 (8th Cir. 1996)).

## V. ANALYSIS

### A. Applicable Standards

The ADEA and the ICRA prohibit discrimination against employees because of age. 29 U.S.C. § 623(a); Iowa Code § 216.6. Absent direct evidence of discrimination, age discrimination claims are analyzed under the *McDonnell-Douglas*[3] burden-shifting framework. *Holmes v. Trinity Health*, 729 F.3d 817, 821 (8th Cir. 2013); *Hulme v. Barrett*, 449 N.W.2d 629, 631-32 (Iowa 1989). The Eighth Circuit Court of Appeals describes the *McDonnell-Douglas* framework, as applied to ADEA and ICRA claims, as follows:

> At the first step of the analysis, the plaintiff has the burden of establishing a prima facie case of age discrimination. . . . A

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

successful showing creates a presumption that the employer unlawfully discriminated against the plaintiff and shifts the burden to the burden to the employer to articulate a legitimate nondiscriminatory reason for its actions. . . . If the employer meets this burden, the presumption of discrimination dissolves and the burden returns to the plaintiff to demonstrate that the proffered reason is a mere pretext for age discrimination.

*Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir. 2013) [citations omitted]. The elements of a prima facie age discrimination claim vary depending on the nature of the claim. When the plaintiff contends that a hiring or promotion decision was based on age, the prima facie elements are: (1) plaintiff was at least 40 year old at the time of the challenged decision, (2) plaintiff was not hired (or was not promoted) and (3) plaintiff was qualified for the job. *Hilde v. City of Eveleth*, 777 F.3d 998, 1004 (8th Cir. 2015). As the *Hilde* panel noted, the Eighth Circuit sometimes includes a fourth factor as being that the employer hired a younger person to fill the position. *Id.* (citing *Tusing v. Des Moines Indep. Comm. School Dist.*, 639 F.3d 507, 515 (8th Cir. 2011)).

When the plaintiff alleges a discharge based on age, the prima facie elements are (1) plaintiff was at least 40 year old, (2) plaintiff suffered an adverse employment action, (3) plaintiff was meeting the employer's legitimate expectations at the time of the adverse employment action, and (4) plaintiff was replaced by someone substantially younger. *Holmes v. Trinity Health*, 729 F.3d 817, 822 (8th Cir. 2013) (citing *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 856 (8th Cir.), *cert. denied*, 133 S. Ct. 313 (2012)).

If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory explanation for the decision. *Ridout*, 716 F.3d at 1083; *see also Hilde*, 777 F.3d at 1004. Once such an explanation is offered, the burden shifts back to the plaintiff to provide evidence that the explanation is pretextual. *Hilde*, 777 F.3d at 1004. At the summary judgment stage, a plaintiff must point to "enough

admissible evidence to raise a genuine doubt as to the legitimacy of the defendant's motive, even if that evidence [does] not directly contradict or disprove [the] defendant's articulated reasons for its actions." *Wierman v. Casey's General Stores*, 638 F.3d 984, 995 (8th Cir. 2011) (pregnancy discrimination claim) (quoting *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005) (internal quotation omitted)). "Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact as to whether the termination was motivated by intentional discrimination." *Burton v. Arkansas Sec. of State*, 737 F.3d 1219, 1230 (8th Cir. 2013) (race discrimination claim) (quoting *Bone v. G4S Youth Services, L.L.C.*, 686 F.3d 948, 955 (8th Cir. 2012) (internal quotation omitted)).

Pretext can be established by (1) "persuading the court that a discriminatory reason more likely motivated the employer", *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1046 (8th Cir. 2010), (2) "showing that the employer's proffered reason is unworthy of credence," *id.*, (3) showing that it was unlikely an employer would have acted on the basis of the proffered reason," *Ridout*, 716 F.3d at 1084, (4) showing the proffered reason was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case, *id.*, or (5) presenting evidence that the employer's proffered reason has changed substantially over time. *Jones*, 608 F.3d at 1046.

A plaintiff may also show pretext through "comparator evidence," which involves showing that a younger employee, similarly situated to plaintiff, was treated more leniently when he or she committed an infraction of comparable seriousness. *Ridout*, 716 F.3d at 1084-85. The comparator employee need not have engaged in the exact same offense, only one of "comparable seriousness." *Id.* Where evidence demonstrates that the comparator employee was disciplined differently, a factfinder may decide whether the different treatment is attributable to discrimination or some other cause. *Id.* Regardless of how the plaintiff shows pretext, the showing requires more

than merely discrediting an employer's asserted reasoning for terminating an employee. *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 470 (8th Cir. 2011). A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus. *Id.*

Under the ADEA, a plaintiff must show that age was a "but-for" cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). Under the ICRA, a plaintiff must only show that age "played a part" in the adverse employment decision and need not prove age was the only reason. *Newberry v. Burlington Basket Co.*, 622 F.3d 979, 982 (8th Cir. 2010) (citing *DeBoom v. Raining Rose Inc.*, 772 N.W.2d 1, 13 (Iowa 2009)).

## B.     Discussion

Lorenz acknowledges that she has no direct evidence of age discrimination. Doc. No. 23-1 at 15. As such, her claim must be evaluated pursuant to the *McDonnell Douglas* framework.

### 1.     Prima Facie Case

Tyson contends Lorenz has failed to establish a prima facie case of discrimination because she cannot show she was meeting Tyson's legitimate expectations. Specifically, Tyson points to Lorenz's record of tardiness and argues that a plaintiff who is habitually tardy is not meeting his or her employer's legitimate expectations. Doc. No. 22-1 at 8. As Lorenz notes, however, Tyson agrees that her actual job performance was acceptable. *See, e.g.*, Doc. No. 22-1 at 2 (acknowledging that Lorenz "was a technically competent employee"). Moreover, the burden of establishing a prima facie case is not onerous, as the purpose of the prima facie showing is to eliminate the most common nondiscriminatory reasons for the employer's decision. *Texas Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981); *see also Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009). A plaintiff must meet a higher standard at the pretext stage of the analysis. *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014).

Reasonable jurors could conclude that Lorenz's recurring tardiness issues constituted a failure to meet Tyson's legitimate expectations. At the pretext stage, however, I find that Tyson is not entitled to such a finding as a matter of law. Given Lorenz's otherwise adequate job performance and the apparently-short duration of Lorenz's tardies (the last one was two minutes), reasonable jurors could similarly find that she was meeting Tyson's legitimate expectations. As such, Tyson is not entitled to a finding that Lorenz has failed, as a matter of law, to establish a prima facie case of age discrimination.[4]

### 2. Has Lorenz Presented Evidence Discrediting Tyson's Explanation?

Lorenz does not dispute that Tyson has offered a legitimate, nondiscriminatory reason for discharging Lorenz – her violations of Tyson's attendance policy. Doc. No. 23-1 at 17. However, Lorenz contends that this reason is pretextual. *Id.* She contends that a younger employee, Derrick Hughes, engaged in similar conduct but was treated more favorably. She also argues that Tyson failed to comply with its own policy concerning counseling and documentation with regard to various alleged instances of tardiness during 2012. I will address both issues before moving on to the question of whether the record supports a finding of discriminatory animus.

---

[4] Neither side devotes much attention to the final element of Lorenz's prima facie claim: whether Tyson replaced Lorenz with a "substantially younger" worker. *Holmes*, 729 F.3d at 822. It appears to be undisputed that Tyson assigned most of Lorenz's former job duties to Constance Ploeger, who was 49 year old (13 years younger than Lorenz) at the time. Doc. No. 22-11 at ¶ 9; Doc. No. 23-20 at 2; Doc. No. 27-1 at ¶ 42. Tyson does not appear to argue that this 13-year age difference fails, as a matter of law, to meet the "substantially younger" standard.

### a. *Comparator Evidence*

Lorenz argues that Hughes, who performed the same job as Lorenz but on a different shift, was allowed to be late for work on several occasions with no adverse consequences. Hughes signed a declaration that includes the following statements:

> 9. While I worked under Ashley [Palmer] there were times I was late and Ashley would not discipline me for it. Typically when I was late Ashley would do nothing. This was true whether I called ahead or not.
>
> 10. Ashley would tell me "if you are a couple of minutes late don't worry about it, people have things to do".
>
> 11. Ashley wasn't the only one watching Carol. There were other management watching her, Shane Greybill and Jerry Davis for example. In other words it seemed like management was just waiting to find some way to terminate her or intimidate her enough to make her retire.
>
> 12. Ashley watched Carol's attendance, when she came in and when she left, on a regular basis.

Doc. No. 23-12 at 2. While the second sentence of paragraph 11 is speculation, the remaining portions of this excerpt appear to be based on Hughes' personal knowledge. For purposes of Tyson's motion, I must accept Hughes' testimony as true.

In response, Tyson argues that Hughes is not a valid comparator because he was not similarly situated to Lorenz. "At the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1230 (8th Cir. 2013) (internal quotation marks omitted). However, the plaintiff "must prove only that the other employees were similarly situated in all relevant respects." *Ridout*, 716 F.3d at 1085 (internal quotation marks omitted). "To demonstrate that they are similarly situated, [the employee] need only establish that

he or she was treated differently than other employees whose violations were of comparable seriousness." *Id*. (internal quotation marks omitted). That is, "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman*, 638 F.3d at 994 (internal quotation marks omitted). "Where evidence demonstrates that a comparator engaged in acts of 'comparable seriousness' but was disciplined differently, a factfinder may decide whether the differential treatment is attributable to discrimination or some other cause." *Ridout*, 716 F.3d at 1085.

In contending that Hughes was not similarly situated, Tyson relies on Lorenz's own statements and impressions about certain events. For example, Tyson cites Lorenz's deposition testimony about (1) an incident in which Hughes was late with notice and (2) a situation in which Hughes received advance permission to be late. Doc. No. 27 at 9. Tyson notes that these events are distinct from Lorenz's conduct of arriving late without calling and without receiving advance permission. While this may be true, Tyson's analysis ignores Hughes' sworn testimony. As noted above, Hughes states that while Palmer was his supervisor, "there were times I was late and Ashley would not discipline me for it." Doc. No. 23-12 at 2. Hughes also states that "[t]ypically when I was late Ashley would do nothing. This was true whether I called ahead or not." *Id*. Finally, Hughes asserts that Palmer all but gave him standing permission to be late, stating "if you are a couple of minutes late don't worry about it, people have things to do." *Id*.

Accepting Hughes' sworn statements as true – which I must do at this point – compels a finding that Tyson treated Hughes more favorably than Lorenz with regard to tardiness. Tyson also argues, however, that such disparate treatment is irrelevant because of the time periods at issue. Tyson notes that Hughes separated from

14

employment in August 2011, more than a year before Lorenz was discharged and shortly before Tyson tightened its attendance expectations due to the Cherokee plant's ongoing struggles. Moreover, Tyson points out that it was not until 2012 that it utilized an automated timeclock system that generated automatic notices of tardy arrivals. According to Tyson, Palmer's treatment of Hughes during and before 2011 has no bearing on how Lorenz's tardiness was handled in 2012.

While reasonable jurors may find Tyson's arguments persuasive, Tyson is not entitled to a finding – as a matter of law – that the passage of time fully explains Hughes' more-favorable treatment. Hughes performed the same job as Lorenz, for the same supervisor, during an overlapping period of time. While Hughes left Tyson before Tyson "cracked down" (Tyson's term) on its employees, his sworn testimony includes his observation that Palmer "watched [Lorenz's] attendance, when she came in and when she left, on a regular basis" during Hughes' employment at Tyson. Doc. No. 23-12 at 2. Thus, accepting Hughes' testimony as true means Palmer was watching Lorenz's attendance closely at the same time he was assuring Hughes that being a couple of minutes late was not a concern.

But for Hughes' declaration, Tyson would have a strong argument that Hughes is not a valid comparator. I agree with Tyson that Lorenz's testimony about Hughes' attendance incidents is not persuasive, as the incidents she describes are not analogous to Lorenz's conduct of being late without calling ahead. Hughes' testimony, however, permits a finding that Palmer treated Hughes less harshly for the same conduct that allegedly led to Lorenz's discharge. Lorenz has raised a genuine issue of material fact as to whether Hughes is a valid comparator and, if so, whether Palmer favored Hughes over her.

### b.    *Company Policy*

Lorenz also seeks to establish pretext by arguing that Tyson violated its own policies when disciplining her for attendance issues during 2012.    According to Lorenz, an attendance notification she received on October 18, 2012, was the first notice Tyson provided as to any instances of tardiness during 2012.    That notification indicated that Lorenz was tardy on March 16, September 26 and October 8 of 2012.    Palmer testified that Tyson has no record of Lorenz receiving any notice of or counseling about the March 16 or September 26 incidents.    Doc. No. 23-16 at 23.    Lorenz notes that under Tyson's Rules of Conduct (ROC) Policy, disciplinary violations were to be addressed with the employee and documented in a timely fashion.    Doc. No. 23-6 at 2-3.    Lorenz argues that the fact Palmer did not bring those incidents to her attention suggests that they were excused at the time but were later used against her to make a case for her discharge. This, she suggests, shows pretext.

In response, Tyson asserts that the ROC Policy is irrelevant because Lorenz was not discharged under that policy.    Instead, according to Tyson, she "was terminated for violating the Management Support Attendance (MSA) Policy."    Doc. No. 27 at 18. Tyson has not come close to establishing the truth of this statement as a matter of law. Tyson cites pages 1 and 31-33 of its summary judgment appendix in support of the statement.    *Id.*    Page 1 is a document entitled "Disciplinary Action Notification" that states Lorenz was discharged for having four unexcused tardies in a 12-month period. Doc. No. 22-4 at 2.    That document makes no reference to the MSA Policy.    Instead, Lorenz's alleged misconduct is described under a heading that reads:    "Rules of Conduct Violation (who, what, where, when)."    *Id.*    This document does not establish, as a matter of law, that the ROC Policy is irrelevant.    If anything, by expressly referencing a "Rules of Conduct Violation," the document adds support to Lorenz's argument that she was discharged pursuant to the ROC Policy.

Pages 31-33 of Tyson's summary judgment appendix is simply the MSA Policy. Doc. No. 22-12 at 2-4. The fact that such a policy existed during the relevant period of time does not, standing alone, render the ROC Policy irrelevant. The MSA Policy does not state that it applies in lieu of the ROC Policy. *Id.* Nor, for that matter, does the ROC Policy state that it excludes conduct that is covered by the MSA Policy. Instead, the ROC Policy states: "When unacceptable behavior warrants disciplinary action, a Disciplinary Action Notification will be used." Doc. No. 23-6 at 2. As noted above, the Tyson form that was used to document the alleged violations that led to Lorenz's discharge was entitled "Disciplinary Action Notification." Doc. No. 22-4 at 2.

I also note that many of Tyson's denials as to the applicability of the ROC Policy are supported by no citations to the record. In responding to certain paragraphs of Lorenz's statement of additional material facts, Tyson asserted that the ROC Policy was not the policy under which Lorenz was terminated but did not direct my attention to any evidence supporting that proposition. *See* Doc. No. 27-1 at ¶¶ 30-32. As I noted earlier, this is contrary to Local Rule 56(d). Tyson's failure to cite to supporting evidence, in combination with the express language of the policies and documents discussed above, leads me to conclude that Tyson has failed to meet its burden of establishing as a matter of law that the ROC Policy did not apply to Lorenz's alleged attendance issues.

If the ROC Policy requirements did apply, then there is at least a genuine issue of material fact as to whether Tyson complied with those requirements in addressing Lorenz's alleged tardies on March 16, 2012, and September 26, 2012. *See, e.g.*, Doc. No. 27-1 at ¶¶ 28-32, 35-37. As noted above, Palmer testified that no documentation exists of any counseling or notification with regard to those incidents. The ROC Policy, however, calls for "a documented counseling" as the first level of disciplinary action for any "unacceptable conduct." Doc. No. 23-6 at 3. Two additional levels of discipline

(written warning and written warning with suspension) follow before discharge. *Id.* Here, the record suggests that Tyson took no action with regard to the first two tardies during 2012, instead waiting until a third alleged tardy in October before providing Lorenz with any documentation of unacceptable conduct. Doc. No. 27-1 at ¶¶ 34-35. Lorenz was then discharged after arriving at work less than two minutes late on December 5, 2012. *Id.* at ¶ 40.

The jury might very well agree with Tyson that the ROC Policy is irrelevant and that Tyson fully complied with the MSA Policy in terminating Lorenz's employment. At this stage of the case, however, Tyson has failed to establish the inapplicability of the ROC Policy as a matter of law. Instead, Lorenz has raised a genuine issue of material fact as to whether Tyson complied with its own policies in connection with her discharge.

Thus, with regard to both comparator evidence and possible noncompliance with company policy, the record allows the finder of fact to discredit Tyson's stated reason for discharge. This does not end the inquiry. The Eighth Circuit has stated:

> The showing of pretext necessary to survive summary judgment "requires more than merely discrediting [defendant's] proffered reason for the adverse employment decision. [Plaintiff] must also prove that the proffered reason was a pretext for age discrimination."

*Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 898 (8th Cir. 2004) (quoting *Spencer v. Stuart Hall Co.*, 173 F.3d 1124, 1128 (8th Cir. 1999)); *see also Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (to create a genuine issue of material fact on pretext "the ultimate question is whether the plaintiff presents evidence of 'conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision ....' ") (quoting *Feltmann v. Sieban*, 108 F.3d 970, 975 (8th Cir. 1997)). I will address that issue next.

### 3.    Has Lorenz Presented Evidence of Discriminatory Animus?

Lorenz points to evidence of several events that, in her view, suggest a discriminatory animus on Palmer's part.   Among other things, she alleges that when Palmer took over as her supervisor, he reorganized the department in such a way as to replace older workers with younger ones.   For example, she contends that he placed two older workers – Stan Nading and Hal Maddox – on performance improvement plans that ultimately caused both to resign.   Lorenz also contends that as older workers left the department, Palmer replaced them with workers who were 35 or younger.   She states that within a short period of time, Palmer's department transitioned from having only one younger worker to having only one older worker – Lorenz.

Lorenz also finds significance in the fact that she was not chosen to replace any of the older workers who left the department during Palmer's tenure.   She states that she applied for various openings and was interviewed for one of them, but was told that her past attendance issues were a barrier.   She argues that age was the real reason and that Palmer was intent on staffing his department with younger workers.

Tyson denies any concerted effort to eliminate older employees and notes that percentage of employees over the age of 40 at the Cherokee plant actually increased each year between 2011 and 2015.   Tyson also argues that a disproportionate share of employees discharged for attendance-related issues were under the age of 40 during those years, meaning Tyson was not using attendance violations as an excuse to weed out older workers.   As for its failure to promote Lorenz to other positions, Tyson argues that this is hardly surprising in light of her disciplinary record.

Tyson's plant-level statistical data does not establish a lack of discriminatory animus as a matter of law.   Lorenz does not allege that Tyson's management made a decision to rid the entire Cherokee plant of older workers.   Her theory is that Palmer – the supervisor of her department – favored younger workers and managed, in short order,

to convert the department from one that consisted primarily of older workers to one in which Lorenz was the last remaining older worker. Evidence of age animus is relevant only to the extent that it relates to the decision-maker or to someone who influenced the decision-making process. *McMannes v. United Rentals, Inc.*, 371 F. Supp. 2d 1019, 1031-32 (N.D. Iowa 2005) (citing *Kiel*, 169 F.3d at 1135). Because Lorenz does not contend that the entire Cherokee plant was under orders to purge older workers, Tyson's plant-level data do not advance Tyson's summary judgment arguments.

When the analysis is (properly) focused on Palmer's department, I find that Lorenz has established facts sufficient to raise a genuine issue as to whether Palmer was motived by age animus. Tyson acknowledges that soon after Palmer was hired in 2011, he brought about the retirement of two older QA managers. Doc. No. 27-1 at ¶ 14 (qualified admission with no citation to the record). Palmer replaced those employees with younger individuals. *Id.* at ¶¶ 16-17. Palmer selected a 35-year-old who had less training than Lorenz and a 26-year-old who had previously been terminated by Tyson due to absenteeism. *Id.* at ¶¶ 18-19 (qualified admissions with no citation to the record). Lorenz was not given the chance to interview for either position. *Id.* at ¶ 20.

Palmer also added a new management position, which he filled with a worker under the age of 40. *Id.* at ¶15. After these various personnel changes, Lorenz was the only employee left in the department who was over the age of 40. *Id.* at ¶ 23. While Tyson has explanations for all of Palmer's hiring decisions, I cannot simply accept each explanation at face value. Instead, I must give Lorenz the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. Lorenz has presented evidence suggesting (a) that she was treated more harshly than a comparable employee (Hughes), (b) that Tyson may have violated its own policy with regard to her alleged attendance issues and (c) that the decision-maker (Palmer) had a practice of

removing older employee from his department.[5]   None of this means Lorenz will prevail at trial, or even that she has a strong case.    It does mean, however, that Tyson has failed to meet its burden of showing that Lorenz's claims fail as a matter of law.

## VI.    CONCLUSION

For the reasons set forth herein, defendants' motion (Doc. No. 22) for summary judgment is **denied**.    This case will proceed to trial as scheduled beginning January 4, 2016.

**IT IS SO ORDERED.**

**DATED** this 3rd day of December, 2015.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE

---

[5] Tyson also argues that Lorenz's deposition testimony, in which she states a belief that Palmer disliked her because she questioned him, precludes her from proving that Palmer was motivated by age animus.   Doc. No. 27 at 19 (citing Doc. No. 22-8 at 10).   I disagree.   While this may be a solid jury argument, Lorenz's belief that Palmer had other reasons for disliking her does not mean the decision to terminate her employment could not have been based on Lorenz's age. Lorenz must show that her age was a "but-for" cause of her discharge (ADEA) or that her age "played a part" in the decision (ICRA).   *Gross*, 557 U.S. at 177-78; *Newberry*, 622 F.3d at 982.   Even if Palmer disliked Lorenz for many non-discriminatory reasons, the record contains sufficient evidence to raise an issue of fact as to whether Lorenz's age was the ultimate cause of Palmer's decision to terminate her employment.